# Illinois Official Reports

## Appellate Court

---

**Commonwealth Edison Co. v. Illinois Commerce Comm'n,**
**2014 IL App (1st) 122860**

---

Appellate Court
Caption

COMMONWEALTH EDISON COMPANY, Petitioner-Appellant, v.
ILLINOIS COMMERCE COMMISSION; CITIZENS UTILITY
BOARD; AARP; THE CHICAGO TRANSIT AUTHORITY; THE
CITY OF CHICAGO; NORTHEAST ILLINOIS REGIONAL
COMMUTER RAILROAD d/b/a METRA; THE PEOPLE OF THE
STATE OF ILLINOIS LOCAL UNION NO. 15, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO;
ILLINOIS POWER AGENCY; THE BUILDING OWNERS AND
MANAGERS ASSOCIATION OF CHICAGO; THE ILLINOIS
INDUSTRIAL ENERGY CONSUMERS (ABBOTT LABORA-
TORIES, INC; CATERPILLAR, INC.; STERLING STEEL
COMPANY; THERMAL CHICAGO; and CHRYSLER
CORPORATION); THE RETAIL ENERGY SUPPLY
ASSOCIATION; CHAMPION ENERGY SERVICES, LLC;
CONEDISON SOLUTIONS; CONSTELLATION NEWENERGY,
INC.; DIRECT ENERGY SERVICES, LLC; ENERGETIX;
ENERGY PLUS HOLDINGS, LLC; EXELON ENERGY
COMPANY; GDF SUEZ ENERGY COMPANY; HESS
CORPORATION; INTEGRYS ENERGY SERVICES, INC.; JUST
ENERGY; LIBERTY POWER; MC SQUARED ENERGY
SERVICES, LLC; MINT ENERGY, LLC; NEXTERA ENERGY
SERVICES; NOBLE AMERICAS ENERGY SOLUTIONS LLC;
PPL ENERGYPLUS, LLC; RELIAN; TRIEAGLE ENERGY, LP;
NUCOR STEEL KANKAKEE, INC.; UNITED STATES
DEPARTMENT OF ENERGY; THE COMMERCIAL GROUP
(BEST BUY COMPANY, INC.; J.C. PENNEY CORPORATION,
INC.; MACY'S, INC.; SAFEWAY, INC.; SAM'S WEST, INC.;
TARGET, INC. and WAL-MART STORES, INC.), THE ILLINOIS
COMPETITIVE ENERGY ASSOCIATION (CONSTELLATION
NEWENERGY, INC.; DIRECT ENERGY SERVICES, LLC;
INTEGRYS ENERGY SERVICES, INC.; MC2 ENERGY
SERVICES; EXELON ENERGY COMPANY; FIRSTENERGY
SOLUTIONS CORPORATION; AMEREN ENERGY
MARKETING; ENERGY, LLC; MIDWEST GENERATION-
EDISON MISSION SOLUTIONS; NORDIC ENERGY SERVICES,

LLC and RELIANT ENERGY, NORTHEAST LLC); THE COALITION TO REQUEST EQUITABLE ALLOCATION OF COSTS TOGETHER (A. FINKL AND SONS COMPANY; AUX SABLE LIQUID PRODUCTS, LP; THE CITY OF CHICAGO; COMMERCE ENERGY, INC.; INTERSTATE GAS SUPPLY OF ILLINOIS, INC.; THE METROPOLITAN WATER RECLA-MATION DISTRICT OF GREATER CHICAGO; PDV MIDWEST REFINING LLC; UNITED AIRLINES, INC., and WELLS MANUFACTURING COMPANY), Respondents- Appellees.

| | |
|---|---|
| District & No. | First District, Third Division<br>Docket Nos. 1-12-2860, 1-12-3526 cons. |
| Filed | March 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the Illinois Commerce Commission's application of what is commonly known as the Energy Infrastructure Modernization Act, the appellate court affirmed the Commission's rulings requiring an adjustment to utility rates charged petitioner's customers to reflect an expected increase in customers served, allocating certain costs between distribution to ratepayers and transmission to out-of-state purchasers, restricting the recovery from ratepayers of performance bonuses paid to employees, denying the recovery from ratepayers of part of the amount paid to an affiliate because the affiliate used the payment to give its employees bonuses based on net income, and denying the recovery from ratepayers for compensation paid to managers in the form of stock in petitioner's parent corporation, since petitioner failed to establish any error in those rulings. |
| Decision Under<br>Review | Petition for review of orders of Illinois Commerce Commission, No. 11-0721. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Commonwealth Edison Company (Thomas S. O'Neill, Anastasia M. O'Brien, and Richard G. Bernet, of counsel), and Jenner & Block LLP (Barry Levenstam, of counsel), both of Chicago, and Jenner & Block LLP (David W. DeBruin, Katherine A. Fallow, and Matthew E. Price, of counsel), of Washington, D.C., for petitioner. |
| | Illinois Commerce Commission, of Chicago (John P. Kelliher and Thomas R. Stanton, of counsel), for respondent Illinois Commerce Commission. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Jane Elinor Notz, Clifford W. Berlow, Janice A. Dale, and Karen L. Lusson, Assistant Attorneys General, of counsel), Lueders, Robertson & Konzen, of Granite City (Eric Robertson and Andrew Rankin, of counsel), Conrad R. Reddick, of Wheaton, and Schuchat, Cook & Werner, of St. Louis, Missouri (Marilyn S. Teitelbaum and Rochelle G. Skolnick, of counsel), for other respondents. |
| | Whitt Sturtevant LLP, of Chicago (Albert D. Sturtevant, of counsel), Whitt Sturtevant LLP, of Columbus, Ohio (Mark A. Whitt, of counsel), and Ameren Services Company, of St. Louis, Missouri (Edward C. Fitzhenry, of counsel), for *amicus curiae*. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1   This case involves the Illinois Commerce Commission's application of section 16-108.5 of the Public Utilities Act, commonly known as the Energy Infrastructure Modernization Act (220 ILCS 5/16-108.5 (West 2012)). After Commonwealth Edison (ComEd) filed its appeal in this case, the General Assembly further amended the Act in a way that resolved some of the issues on appeal. ComEd now challenges the Commission's rulings (1) requiring an adjustment to rates charged to ComEd customers to reflect the expected increase in the number of customers served; (2) allocating certain general costs between distribution to ratepayers and transmission to out-of-state purchasers; (3) restricting ComEd's recovery from ratepayers for

certain performance bonuses paid to ComEd employees; (4) denying ComEd recovery from ratepayers for part of the amount ComEd paid to an affiliate, because the affiliate used the payment to give its employees bonuses based on net income; and (5) denying ComEd recovery from ratepayers for compensation paid to ComEd managers in the form of stock in ComEd's parent corporation. We find that ComEd did not meet its burden of showing error in any of the contested rulings. Accordingly, we affirm the Commission's order.

¶ 2                                BACKGROUND

¶ 3        The Act, as amended, permits electric utilities to use a "performance-based formula" (220 ILCS 5/16-108.5(b) (West 2012)) to set rates for delivery of the electricity it sells. To use the formula, the utility must first establish its revenue requirement for a calendar year, subject to the Commission's approval, using the formula: revenue requirement = operating expenses + cost of capital. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991). In this formula the cost of capital equals the rate base, defined as the total value of all invested capital, times the rate of return on capital. See *Business & Professional People*, 146 Ill. 2d at 195. The utility must then allocate the revenue requirement to several established classes of ratepayers, and set rates, based on historical data, which the utility expects to generate the required revenues.

¶ 4        To project its revenue requirement for a calendar year, say 2020, in 2019 the utility will use its actual expenses for 2018 plus the cost of projected capital additions and depreciation expenses for 2019, as an approximation of the 2020 expenses to recover through its 2020 rates. The utility will also include in its revenue requirement for 2020 the sum needed to reconcile its projected revenue requirement for 2018 with its actual costs (including the cost of capital) incurred in 2018. The Act permits the utility to collect interest on the reconciliation amount for the time between the payment of the costs, in 2018, and its subsequent collection of the reconciliation amount from ratepayers. 220 ILCS 5/16-108.5(c)(6) (West 2012). In exchange for the legislative guarantee of payment, the utility must commit to making very substantial investments in updating and improving its facilities, and hiring new employees. 220 ILCS 5/16-108.5(b) (West 2012).

¶ 5        In 2011, ComEd chose to file a new rate tariff using the performance-based formula set out in the Act. ComEd promised to invest $1.1 billion over 5 years in system upgrades, modernization projects, and training facilities, plus an additional $1.5 billion within 10 years in further technological upgrades. ComEd also promised to create 2,000 new, full-time jobs. See 220 ILCS 5/16-108.5(b) (West 2012).

¶ 6        The Commission staff and a number of other ratepayers opposed parts of the proposed rate tariff. The Commission permitted several of the ratepayers to intervene in proceedings on the proposed tariff. The Commission accepted transcripts of testimony from a number of witnesses for ComEd, the staff, and the intervenors. After the written submissions narrowed the issues, the Commission heard live testimony from several witnesses.

¶ 7        The disputed issues centered on the reconciliation process. In particular, the parties disagreed about when to include new capital additions in the rate base, and how much interest ratepayers needed to pay on the reconciliation amount.

¶ 8                                       Rate Base

¶ 9         In its proposed tariff, ComEd included in its rate base for a given year all additions to the rate base it made that year. That is, under its formula, it will include in the rate base for 2018 all of the additions to the rate base that it makes in 2018 and recover a cost of capital for 2018 as though it used all of the capital additions throughout the year.

¶ 10        Witnesses for the staff and intervenors pointed out that with ComEd's methods, it will start earning its return on capital on January 1, 2018, for all investments it makes during 2018, even if it does not make the investment until December 2018. ComEd will start earning its rate of return on all of its investments before it makes those investments, sometimes earning the rate of return for several months prior to the investment. The staff and intervenors recommended instead a formula that would have the Commission use an average of the rate base as of December 31, 2017, and December 31, 2018, to determine the rate base on which ComEd would earn its return on capital for 2018. The witnesses explained that ComEd's data, and the Act, constrained them to use only year-end data to determine the rate base in effect for a calendar year. The Act does not permit adjustments to make each investment start earning a return as part of the cost of capital on the date that ComEd makes the investment.

¶ 11        If the Commission adopted the staff's recommendation, ratepayers would pay as the cost of capital for 2018 the established rate of return for all capital equipment in use for the entire year, plus that same rate for half of the capital investments made during the year. The staff's recommendation effectively gives ComEd its full return on its new investments at the rate set for that year if ComEd distributes its new investments evenly throughout the year. If ComEd makes most of its investments before July 1, it would earn somewhat less than the set rate of return on capital for its new investments; if it makes the bulk of its new investments after July 1, it would earn more than the set rate of return on its new investments. But under the staff's proposal, ComEd would not get the consistent overpayment it sought through the formula it used, by which it never would make a new investment before the investment started earning its rate of return, and all new investments would consistently earn a rate of return in excess of the rate of return set for the year. Witnesses estimated that, because of the capital investments ComEd promised to make as a prerequisite for using the Act's performance-based formula for rates, ComEd's method for calculating its rate base would overstate its revenue requirement by about $15 million to $20 million per year.

¶ 12        The Commission adopted the recommendation of the staff and most of the intervenors, setting the rate base for each year as the average of the rate base at the end of the prior year and the rate base as of the end of the year at issue.


¶ 13                                        Interest

¶ 14        ComEd sought to earn interest on the reconciliation amount at the rate of return set for its total capital. The Act sets forth a formula for determining the cost of equity as a part of return on capital, and then the Commission uses that number and appropriate rates of return for long-term and short-term debt to find an overall cost of capital. The parties agreed that the formula permits ComEd to recover as part of its revenue requirement for 2010, for recovery through 2012 rates, a 10.05% return on equity, calculated as the average yield on United States Treasury bonds (4.25% in 2010) plus 580 basis points (4.25% + 5.80% = 10.05%). 220 ILCS 5/16-108.5(c)(3) (West 2012). The parties further agreed that the Commission should allow about a 6.4% return on long-term debt, and 0.72% return on short-term debt. About 46% of

ComEd's capital comes from equity, more than 53% comes from long-term debt, and the remainder, about 0.5%, comes from short-term debt. Using the statutory formula yields an overall cost of capital of about 8.1%, computed approximately as $(.46 \times 10.05\%) + (.535 \times 6.4\%) + (.005 \times 0.72\%)$.

¶ 15 The staff argued that the overall rate of return on capital compensates ComEd for the risk it incurs by investing in capital assets needed to produce electricity for a long period of time. If it invests unwisely, in assets that do not warrant their cost, the Commission may not permit ComEd to recover from ratepayers for the investments. If other energy sources replace electricity before the assets have exhausted their productive lives, ComEd may have excess production capacity and an insufficient market from which to recover its costs. Because of such risks, the Act requires ratepayers to give ComEd a return on equity far in excess of the rate of return for very safe investments. The Act systematically requires the cost of equity to exceed the return on Treasury bonds by 580 basis points. 220 ILCS 5/16-108.5(c)(3) (West 2012).

¶ 16 The staff observed that under the Act ComEd will recover the reconciliation amount without facing any risk similar to the risks that justify the rate of return for equity. ComEd's own witness testified that the reconciliation amount "[i]n essence *** represents a loan to customers for services already provided." The reconciliation amount differs from a conventional loan in that the legislature mandated payment of the reconciliation amount through rates charged two years after ComEd makes the advance payments. The rates even compensate ComEd for uncollectible debts, so ComEd does not face even the risks of a conventional loan to the state. The staff's witness recommended setting interest at the rate of a AAA-rated bond for a period of two years.

¶ 17 The Commission said:

"Regarding our review of the various positions on this issue the Commission shares the concern raised by Staff that using the [cost of capital] as ComEd proposes would treat the reconciliation amount like a rate base investment rather than a reconciling item. We also find cred[ible] the point raised by the Company that the reconciliation adjustments will represent significant investments and operating expenses funded by the participating utility.

The Commission recognizes that the due to the [Act's] timeline for the reconciliation period the interest rate is both short term and long term in nature. *** The Commission believes there is value in setting an interest rate based upon debt that is relevant to the Company for the time duration of the reconciliation. In order to capture the unique aspects of the relevant period we find that a hybrid approach should be utilized to determine the appropriate interest rate. Such a hybrid calculation would take the weighted costs of short-term debt and long-term debt and exclude the weighted cost of common equity as the methodology in calculating the interest rate. This results in an interest rate of 3.42%. The Commission concludes that this hybrid interest rate of 3.42% is reasonable and appropriate to be utilized for the reconciliation period and is hereby adopted."

¶ 18 Population Adjustment

¶ 19 Several intervenors, including the Attorney General, note that with some of the construction ComEd promised when it filed the new rate tariffs under the Act, ComEd

proposed the building of new facilities to accommodate growth in the number of customers it serves. The Attorney General pointed out that if the rates for 2012 spread the collection of the revenue requirement amongst ratepayers for 2010, without any adjustment for the expected increase in the number of customers from 2010 to 2012, ComEd will systematically collect sums in excess of its revenue requirement. The Attorney General asked the Commission to adjust rates to reflect the anticipated size of each class of ratepayers.

¶ 20 ComEd argued that the Act did not permit an adjustment for anticipated population changes, because the Act mentioned only weather normalization, and not population changes, usage changes, or any other possible determinant of total sales. ComEd pointed out that it had recently suffered a decline in kilowatt hour sales per customer in some of its classes of customers, and the Commission did not adjust rates for a possible further decline in sales per customer.

¶ 21 The Commission held:

"All that [the Attorney General] proposes here is a methodology to ensure that the billing determinants are based on accurate information. As [the Attorney General and others] point out, Section 16-108.5(c)(1) of the statute provides that formula rates must be prudently incurred and reasonable in amount consistent with Commission practice and law. ***

* * *

*** Without information as to what causes a decline in [kilowatt hour] sales, it does not appear that this decline should offset the increase in billing determinants that reflects ComEd's new business. ComEd, in short, has not presented valid reasons for rejecting the [Attorney General's] proposal."

¶ 22 The Commission ordered ComEd to adjust its rates to reflect anticipated increases in the number of customers it served.

¶ 23 Cost Allocation

¶ 24 General and intangible plant and wages serve all of ComEd's ratepayers, and they also contribute to the sales of energy transmitted to purchasers from out of state. Section 16-108.5(c)(4)(I) of the Act (220 ILCS 5/16-108.5(c)(4)(I) (West 2012)) directs the Commission to allocate the costs of general and intangible wages and plant, along with other common costs including real estate taxes, between the distribution of power to Illinois ratepayers and the transmission of power out of state. The Commission sets only the rates for power distributed to ratepayers in Illinois. The Federal Energy Regulatory Commission (FERC) regulates the interstate transmission of energy.

¶ 25 In its filed tariff, ComEd used a formula for allocating the general costs that differed from the formula the Commission used in prior rate cases, and the proposal allocated several million dollars more to the amounts set for recovery from ratepayers. ComEd contended that its new formula coincided with the formula it used in its filings with FERC and assured that ComEd would fully recover all its costs, either from ratepayers or from out-of-state purchasers. According to ComEd, the use of a different formula for allocating costs might allow some costs to remain unrecovered, trapped between the FERC and Commission tariffs.

¶ 26 The staff argued that ComEd had not shown that its new proposal aligned costs with methods FERC required for cost allocation. The staff also pointed out that for determining the

percent of common wages to allocate to ratepayers, ComEd used less than all general wages as the denominator, leading to an overstatement of the percentage of common wages recoverable from ratepayers.

¶ 27    The Commission said:

> "ComEd points to no fact in its argument indicating that there actually is such a 'trapping' between the two jurisdictions. ***
>
> The Commission also disagrees with ComEd's contentions that it has met its burden of proof regarding the need to change its methodology, after several years, and, that it has established that costs are being 'trapped' between the two jurisdictions (this Commission and the FERC). ***
>
> *** There has been no showing on the part of ComEd that there is any circumstance that warrants any change from what the Commission has approved in [the prior rate case], and in the decade or so preceding the final order in that docket ***."

¶ 28    The Commission separately noted that it found no justification for changing the allocation of real estate taxes.

¶ 29                              Limit on Performance Incentives

¶ 30    The Act directs the Commission to set protocols for the "recovery of incentive compensation expense that is based on the achievement of operational metrics, including metrics related to budget controls, outage duration and frequency, safety, customer service, efficiency and productivity, and environmental compliance." 220 ILCS 5/16-108.5(c)(4)(A) (West 2012). ComEd set performance goals for ComEd as a whole and for each group of employees, using metrics of the kinds listed in the Act. ComEd set in advance the amount of bonuses an employee would receive if ComEd and the group that included the employee achieved 100% of the goals ComEd set. But ComEd and the groups of employees could exceed the preset goals, and ComEd sought to recover from ratepayers' bonuses to employees of more than 100% of the preset bonuses when performances of employee groups exceeded goals. ComEd shifted funds from the incentive bonus plan in place before it filed the new tariff to a plan set up to take advantage of the changes in the Act and the performance-based tariff.

¶ 31    A witness for the City of Chicago (the City) explained that when ComEd set the bonus amount for meeting all goals as part of its incentive compensation plan, it set the amount as "a form of ratepayer protection by capping overall [incentive bonus] payouts ***. Allowing [incentive bonus] expense in the Formula Rate Plan to increase based on management's, or the boards, discretionary lifting of the net income limiter removes or negates that ratepayer protection." The witness concluded that the Commission should permit ComEd to award bonuses to its employees in excess of the preset bonuses, "but any increases in [incentive bonus] payouts resulting from such discretionary increases should be borne by shareholders, not by ratepayers. It is unreasonable for ratepayers to pay additional expense for incentive compensation based on CEO discretion to increase the limitation otherwise provided by the net income limiter." The City asked the Commission to limit ComEd's recovery from ratepayers to 100% of its preset bonus amounts if it achieved all of the performance goals it set.

¶ 32    The staff agreed with the City that the discretionary increases in the bonuses rendered the limiting feature for bonuses deceptive. The staff and other intervenors noted that in transferring funds to the new bonus plan, ComEd could manipulate performance measures for

various groups of employees to circumvent payout limits. But, unlike the City, the staff recommended a cap of 102.9% of the preset bonuses, a number used in the prior rate case, as the limit ComEd could recover from ratepayers. The excess would allow ComEd to recover a reasonable amount of the incentives it paid to encourage employees to exceed performance goals, while still limiting the cost to ratepayers of performance bonuses.

¶ 33 The Commission held:

"[W]ithout some sort of cap on [incentive] programs, as Staff [and intervenors] point out, there can be manipulation on the part of management at ComEd between the two programs without any real accountability to ratepayers as to what the employees actually did to earn incentive compensation benefits. However, the Commission declines to modify ComEd's two incentive compensation plans to exclude this discretionary power from the plans. ***

The Commission does, however, find that a cap on incentive compensation benefits that are recoverable through rates is necessary, given the potential for manipulation between the two incentive compensation programs. The Commission therefore adopts Staff's cap of 102.9% for any incentive program. Doing so allows for some growth in incentive compensation for ComEd's employees, while placing a damper on the ability of ComEd's management to manipulate the caps on these programs in a manner that increases rates without evidence that adequate benefits flow to ratepayers. However, because the Commission places these restrictions on incentive compensation recovery through rates going forward, we decline to adopt the [City's proposed] adjustment to remove this expense for 2010. The Commission thus disallows $2,142,000 [of the bonus expense as an addition to the revenue requirement]."

¶ 34                                          Payment to Affiliate

¶ 35 Exelon Corporation, a utility services holding company, operates ComEd as its subsidiary. ComEd purchases some services from another subsidiary of Exelon, Exelon Business Services Co. (BSC). The payments from ComEd to BSC include amounts used to pay BSC employees incentive bonuses based on BSC's net income and earnings per share goals. ComEd included the full payments it made to BSC in its operating costs, for recovery from ratepayers. A witness for intervenors asked the Commission to reduce the amount of the compensation to BSC recoverable from ratepayers by an amount that reflected the incentive bonuses BSC paid its employees. The staff agreed with the intervenor's witness, arguing that the Act does not permit recovery from ratepayers of bonuses based on net income or earnings per share. See 220 ILCS 5/16-108.5(c)(4)(A) (West 2012).

¶ 36 ComEd argued that the section only forbids compensation from ratepayers for incentive compensation ComEd pays its own employees based on an affiliate's net income or earnings per share, not compensation ComEd pays to an affiliate which includes the affiliate's incentive compensation to its own employees.

¶ 37 The Commission held that the Act gives it "jurisdiction over affiliated interests having transactions *** with electric *** public utilities under the jurisdiction of the Commission." 220 ILCS 5/7-101(2)(ii) (West 2012). Under ComEd's proposed rates, ratepayers ultimately would pay the incentive compensation to BSC employees. The Commission held:

"[R]atepayers pay for this incentive compensation and ratepayers are entitled to proof, in this docket, that this portion of BSC's charges is being prudently incurred. \*\*\* However, this record lacks such proof. \*\*\*

Further, \*\*\* the 'earnings-per share' program provides corporate incentive to increase profits, without regard to consumers' welfare. Because the issue here is 'earnings-per share' type of incentive compensation that is awarded to BSC employees, it appears that BSC's employees may be motivated to increase corporate profits at the expense of rate-paying consumers."

¶ 38    The Commission adopted the staff's proposed adjustment reducing the amount ComEd could recover from ratepayers for the services BSC provided.

¶ 39                                    Restricted Stock Program

¶ 40    ComEd pays some of its managers part of their compensation in the form of shares of Exelon stock. ComEd makes the same stock payments regardless of corporate net income or earning per share. The staff's accounting expert testified that the payment in this form aligns the managers' interests with the interests of Exelon shareholders. Exelon's shareholders benefit from increases in ComEd's corporate profits, which ComEd may gain at the expense of ratepayers. The accounting expert saw no evidence that the payments in Exelon stock benefitted ComEd's ratepayers.

¶ 41    ComEd argued that it needed to provide extra compensation to retain key managers. ComEd offered no explanation for the need to use Exelon stock, rather than a form of compensation that would not make managers benefit from increasing rates, to retain key managers.

¶ 42    The Commission noted that it had disallowed recovery from ratepayers for the cost of the same compensation program in the previous two rate cases ComEd brought, and ComEd had not shown that the program met statutory criteria for inclusion in costs recoverable from ratepayers. See 220 ILCS 5/16-108.5(c)(4)(A) (West 2012). The Commission again disallowed recovery from ratepayers for the compensation paid to key ComEd managers in Exelon stock.

¶ 43                                    Charitable Contributions

¶ 44    ComEd sought to recover from ratepayers $6 million for contributions ComEd made to charitable organizations ComEd chose. The Act expressly permits ComEd to recover from ratepayers, in addition to the costs of producing energy, the total of ComEd's "donations \*\*\* for the public welfare or for charitable scientific, religious or educational purposes." 220 ILCS 5/9-227 (West 2012). That is, under the Act, ComEd in effect gives the ratepayers' money to charitable organizations ComEd chooses. ComEd then charges the ratepayers interest on the donations, at an interest rate currently in excess of 8% per year. ComEd retains the interest on the donations of the ratepayers' funds ComEd makes to charitable institutions. Applying the Act as written, the Commission allowed ComEd to include as recoverable costs, earning interest at the approved rate, all but a small portion of ComEd's $6 million in charitable donations.

¶ 45                                    Rehearing and Appeal

¶ 46    ComEd asked the Commission to reconsider several of its rulings. ComEd especially challenged the rulings concerning (1) what part of its capital investments for a given year it counts as part of its rate base for that year; (2) the interest ratepayers needed to pay on reconciliation amounts; and (3) the formula for recovering pension costs. Staff and several intervenors opposed the motion for rehearing on those three issues. ComEd also requested rehearing on issues of using expected population growth in setting rates, allocation of costs between in-state distribution and transmission out of state, limits on recovery for employee bonuses, limits on recovery for payments to BSC, and payment to managers in Exelon stock. Only the staff opposed the request for rehearing on these additional issues.

¶ 47    The Commission granted the motion for rehearing, but it limited the rehearing to the rate base, interest and pension issues. In an order dated October 3, 2012, the Commission reaffirmed its rulings on the rate base and interest, but it reversed its ruling on pensions and adopted ComEd's proposal for recovering costs of funding pensions. ComEd filed a timely notice of appeal.

¶ 48                                        Legislative Intervention

¶ 49    During the pendency of this appeal, the General Assembly amended the Act further, expressly superseding and preempting the Commission's order of October 3, 2012. Pub. Act 98-15, § 1 (eff. May 22, 2013). With the amendment, the General Assembly expressly adopted ComEd's calculation of its rate base and the interest ratepayers must pay to ComEd on the reconciliation amount. Pub. Act 98-15, § 1 (eff. May 22, 2013). Under the amended Act, for all of the capital investments ComEd makes in 2018, ComEd will start earning its return on capital on January 1, 2018–even if ComEd does not actually make any investment until December 2018. Witnesses estimated the systematic overstatement of the cost of capital that the General Assembly approved at about $15 million to $20 million per year. The General Assembly then awarded ComEd interest on all reconciliation amounts, including the reconciliation needed for the overstatement of ComEd's return on capital, at a rate that includes a cost of equity that exceeds the interest rate for safe investments by 580 basis points, despite the lack of risk to justify the award of such an interest rate. The parties agree that the amendment determines issues concerning the rate base and interest the Commission must use for reconciliation purposes. The parties also agree that the determination of those issues does not affect ComEd's appeal on the issues of adjusting rates for population changes, allocating costs, limiting recovery for performance bonuses, limiting recovery for payments to affiliates, and denying recovery for payments to managers of Exelon stock. None of the intervenors have addressed the issues remaining before this court. We consider the appeal on the briefs of only ComEd and the staff.

ANALYSIS

## Standard of Review

The Act establishes the applicable standard of review:

"The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10-201(d) (West 2012).

Neither party challenges the Commission's evidentiary rulings, and neither party argues that the Commission's order lacks sufficient findings for informed judicial review. See 220 ILCS 5/10-201(e)(ii), (e)(iii) (West 2012). ComEd does not contest the Commission's jurisdiction, nor does ComEd argue that the proceedings violated state or federal law. Thus, under section 10-201(e)(iv) of the Act, this court should not disturb the Commission's rulings unless "[the rulings] are not supported by substantial evidence based on the record; the Commission acted outside the scope of its statutory authority; the Commission issued findings in violation of the State or Federal Constitution or law; or the proceedings or the manner in which the Commission reached its findings violates the State or Federal Constitution or laws." *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 120-21 (1995); see 220 ILCS 5/10-201(e)(iv) (West 2012). Although the Commission's interpretation of the Act does not bind this court, "the interpretation of a statute by the agency charged with the administration of the statute is entitled to substantial deference [citation], and such construction should be and normally is persuasive." *Milkowski v. Department of Labor*, 82 Ill. App. 3d 220, 222 (1980).

## Population Adjustment

ComEd argues first that the Commission violated the Act by mandating an adjustment of rates to reflect the expected growth in the number of customers served. The Act provides: "The performance-based formula rate approved by the Commission shall *** [p]ermit and set forth protocols, subject to a determination of prudence and reasonableness consistent with Commission practice and law, for *** historical weather normalized billing determinants ***." 220 ILCS 5/16-108.5(c)(4)(H) (West 2012).

The Act does not specifically mention adjustments to performance-based rates for expected changes in the number of customers, usage, or any other determinant of total sales, apart from weather normalization. ComEd argues that the Act forbids any rate adjustment for expected changes in the number of customers served.

The staff counters that the Act directs the Commission to determine rates "subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(4) (West 2012). With appropriate deference to the Commission's interpretation of the Act, we find that ComEd has not met its burden of proving that the Commission violated the Act when it required an adjustment of ComEd's rates to take into account expected growth in the number of customers it served.

ComEd also argues that we should reverse the population adjustment as arbitrary and capricious, because the Commission chose not to adjust rates for other billing determinants,

like expected usage per customer. ComEd showed that in one year it experienced a decline in kilowatt hour sales per customer in some classes of customers. However, the Commission made a factual finding that ComEd did not show a cause for the decrease, and the Commission could not project on the basis of ComEd's data whether ComEd would likely experience further declines in sales per customer. We agree with the Commission that ComEd has not met its burden of showing that the Commission's finding is contrary to the manifest weight of the evidence, or that the Commission acted unreasonably when it ordered an adjustment to rates to account for the expected increase in the number of customers served. See *Ellison v. Illinois Racing Board*, 377 Ill. App. 3d 433, 440-41 (2007).

¶ 59                                    Cost Allocation

¶ 60        Next, ComEd contends that the Commission's method for allocating general costs between distribution to the ratepayers in Illinois, and transmission to out-of-state buyers, violated federal law. ComEd admits that the Commission applied the same formula for allocating costs to distribution and transmission that it used in several previous rate cases. The staff does not dispute ComEd's evidence that it filed documents with FERC in which it allocated a greater percentage of its costs of general wages and plant, including real estate taxes, to distribution, thereby reducing the price for the electricity ComEd sold to out-of-state purchasers.

¶ 61        The staff argued that ComEd presented no evidence that FERC rules required the allocation for which ComEd sought approval. ComEd knew from past cases the allocation formula the Commission had approved, and it presented no evidence that it could not have applied the same allocation formula in its FERC filings. ComEd's desire to recover a larger part of its costs from ratepayers, rather than from out-of-state purchasers, does not suffice as grounds for rejecting the Commission's allocation of costs in a manner consistent with allocations used in prior rate cases. ComEd has not met its burden of proving that the Commission violated federal or state law or acted unreasonably in its allocation of part of general wages and plant costs, including real estate taxes, to distribution of power to Illinois ratepayers.

¶ 62                    Limit on Recovery of Performance Incentives

¶ 63        ComEd maintains that the Commission violated the Act when it imposed a limit on the amount ComEd can charge ratepayers for approved performance bonuses paid to its employees. A witness explained that ComEd could manipulate the performance metrics to award larger bonuses, thereby negating the beneficial effect of the net income limiter on bonuses. ComEd has not presented any evidence to show the witness's conclusions erroneous. The Commission held that because of the possibility of manipulation, it would restrict the recovery of bonuses from ratepayers to 102.9% of the preset incentive bonus amount promised for meeting all of ComEd's performance goals, even if ComEd exceeded those goals by more than 2.9%. The Act permits ComEd to recover certain bonuses for performance incentives, but the Act leaves that recovery "subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(4) (West 2012). In view of the possibility of manipulation, we cannot say that ComEd has met its burden of proving that the Commission violated the Act or acted unreasonably in limiting ComEd's recovery from ratepayers to 102.9% of the preset incentive bonus amount.

¶ 64        ComEd also claims that the Commission's order is internally inconsistent. ComEd points to this passage:

> "However, because the Commission places these restrictions on incentive compensation recovery through rates going forward, we decline to adopt the CUB/City adjustment to remove this expense for 2010. The Commission thus disallows $2,142,000."

¶ 65        In this passage, the Commission rejected the proposal from the City and the Citizens Utility Board for limiting the bonus recoverable from ratepayers for 2010 to 100% of the preset bonus. The Commission instead adopted the staff's proposal, limiting the bonuses recoverable through rates to 102.9% of the preset bonus, in accord with a ruling in a prior rate case. Under the staff's proposal, the Commission deducted $2,142,000 from the costs ComEd included in its proposed revenue requirement, instead of making the larger deduction the City proposed. We see no inconsistency or ambiguity of the order on this issue.

¶ 66                                    Payment to BSC

¶ 67        The Commission did not allow ComEd to recover from ratepayers the full payment ComEd made to its affiliate, BSC, for services BSC performed. The Commission found that part of the payment reflected an amount needed to pay bonuses to BSC employees, where the employees earned the bonuses when BSC met certain net income and earnings per share targets. ComEd claims that the Commission violated the Act, because the Act does not give the Commission jurisdiction over BSC.

¶ 68        The Act provides, "[i]ncentive compensation expense that is based on net income or an affiliate's earnings per share shall not be recoverable under the performance-based formula rate." 220 ILCS 5/16-108.5(c)(4)(A) (West 2012). The Commission interpreted this provision to permit it to disallow recovery from ratepayers of that part of any payment ComEd makes to an affiliate that goes to payment of bonuses paid to the affiliate's employees based on the net income or earnings per share of the affiliate. ComEd argues that the Act means only that ComEd cannot recover from ratepayers the incentive compensation it pays its own employees based on an affiliate's net income or earnings per share. According to ComEd, the Act requires recovery from ratepayer for amounts ComEd pays to an affiliate to provide incentives for the affiliate's employees to improve the affiliate's net income.

¶ 69        ComEd asks us to read into the Act a limitation not expressed in the Act. But "[a] court may not inject provisions not found in the statute." *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 154 (1997). We find that the Commission's interpretation of the Act accords with the words of the Act. Deferring to the Commission's expertise in interpreting the Act, we hold that ComEd has not shown that the Commission erred when it disallowed recovery from ratepayers of part of the amount ComEd paid to its affiliate, to reflect the part of the payment from ComEd that provided incentive bonuses to the affiliate's employees based on the affiliate's net income. *Milkowski*, 82 Ill. App. 3d at 222.

## Restricted Stock Program

¶ 71 Finally, ComEd contends that the Commission erred when it did not allow ComEd to recover from ratepayers the cost of stock in Exelon that ComEd paid to certain managers. The staff's witness explained that the form of compensation ComEd chose aligned the managers' interests with the interests of Exelon's shareholders. In particular, because ComEd chose to pay the managers in Exelon stock, the managers earn more compensation by maximizing Exelon's price per share, where Exelon's net income and earnings per share correspond roughly with the price per share of Exelon's stock. Thus, the managers earn more by maximizing the profits that ComEd extracts from its operations. Maximizing the revenue ComEd receives from its ratepayers helps increase its profits. We agree with the Commission that ComEd did not meet its burden of proving that aligning the interests of its managers with the interests of shareholders, and giving the managers an incentive to maximize the cost to ratepayers of ComEd services, served the interests of ratepayers. The Commission did not err when it disallowed recovery from ratepayers for amounts ComEd paid to its managers to align the managers' interests with the interests of Exelon shareholders.

## CONCLUSION

¶ 73 ComEd did not meet its burden of proving that the Commission made findings contrary to the manifest weight of the evidence, misinterpreted the Act, or misapplied the Act to the facts in its decisions to disallow recovery from ratepayers for bonuses in excess of 102.9% of preset bonus amounts for meeting performance targets, bonuses paid to an affiliate's employees, and incentive compensation paid to managers in the form of Exelon stock. ComEd also did not meet its burden of showing error in the Commission's decision to adjust rates for expected increases in the number of customers ComEd will serve, and to allocate costs of general wages and plant in accord with the formula used in prior rate cases, rather than using the formula ComEd adopted for its filings with FERC. Accordingly, we affirm the Commission's order.

¶ 74 Affirmed.