# Illinois Official Reports

## Appellate Court

---

*Commonwealth Edison Co. v. Illinois Commerce Comm'n*,
**2014 IL App (1st) 130302**

---

| | |
|---|---|
| Appellate Court Caption | COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION; THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* THE ATTORNEY GENERAL OF THE STATE OF ILLINOIS; AARP; BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO; CITIZENS UTILITY BOARD; CITY OF CHICAGO, Respondents. |
| District & No. | First District, Third Division<br>Docket Nos. 1-13-0302, 1-13-0493 cons. |
| Filed<br>Rehearing denied | June 30, 2014<br>September 15, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the consolidated review of the Illinois Commerce Commission's rulings in petitioner's statutory rate update and reconciliation case for 2012, the appellate court found that petitioner failed to meet its burden of showing any error in the contested rulings by the Commission or the denial of 2011 Rate Case expenses, and the legal issues with respect to the billing determinants and cost allocation were resolved in the 2011 Rate Case, which constituted a collateral estoppel bar to relitigation. |
| Decision Under Review | Petition for review of orders of Illinois Commerce Commission, No. 12-0321. |
| Judgment | Affirmed. |

Counsel on
Appeal

Barry Levenstam, of Jenner & Block LLP, and E. Glenn Rippie, of Rooney Rippie & Ratnaswamy LLP, both of Chicago, and David W. DeBruin and Matthew E. Price, both of Jenner & Block LLP, of Washington, D.C., for petitioner.

Lisa Madigan, Attorney General, of Chicago (John P. Kelliher and Thomas R. Stanton, Special Assistant Attorneys General, of counsel), for respondent Illinois Commerce Commission.

No brief filed for respondent Citizens Utility Board.

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Hyman and Mason concurred in the judgment and opinion.

## OPINION

¶ 1        This is a consolidated case for review of the rulings of the Illinois Commerce Commission (Commission) in Commonwealth Edison's (ComEd) 2012 statutory rate update and reconciliation case (2012 Rate Case), applying section 16-108.5 of the Public Utilities Act, commonly known as the Energy Infrastructure Modernization Act (220 ILCS 5/16-108.5 (West 2012)), which amended the Public Utilities Act (220 ILCS 5/1-101 *et seq*. (West 2012)). ComEd seeks review of three issues in the 2012 rate update order: (1) the billing determinants; (2) the allocation of certain common costs that ComEd incurs in connection with its interstate transmission service and its local delivery service; and (3) the denial of most of ComEd's 2011 rate case attorney fees and expenses as costs. ComEd argues that the Commission's errors on these issues, taken together, prevent ComEd from recovering millions of dollars in its actual costs to provide electric service to its customers. We hold ComEd has failed to sustain its burden on appeal of establishing error by the Commission.

¶ 2                                BACKGROUND
¶ 3        The Public Utilities Act, as amended, permits electric utilities to use a "performance-based formula" (220 ILCS 5/16-108.5(b) (West 2012)) to set rates for delivery of the electricity they sell. Under section 16-108 of the Electric Service Customer Choice and Rate Relief Law of 1997, a utility is required to file a delivery services tariff (DST) with the Commission at least 210 days prior to the date on which the utility is to begin supplying such services. 220 ILCS 5/16-108(a) (West 2012). The Commission is then required to enter an order approving or approving as modified the utility's DST no later than 30 days prior to the date on which the utility is to begin supplying such services. 220 ILCS 5/16-108(b) (West 2012).

¶ 4     In 2011, the legislature enacted the Energy Infrastructure Modernization Act, which is section 16-108.5 of the Public Utilities Act (220 ILCS 5/16-108.5 (West 2012)), to stimulate new investments by utilities in the State's energy infrastructure. The Act provides for guaranteed payment of utilities' costs and a rate of return for its investments in infrastructure. "A public utility is entitled both to recover in its rates certain operating costs and to earn a return on its rate base (*i.e.*, the amount of its invested capital)." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001) (citing *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200 (1988)).

¶ 5     In exchange for this legislative guarantee of payment, the utility must commit to making very substantial investments in updating and improving its facilities, and in hiring new employees. 220 ILCS 5/16-108.5(b) (West 2012). A public utility's participation in the Act is voluntary. 220 ILCS 5/16-108.5(b) (West 2012). ComEd is a participating utility and committed to invest an estimated $2.6 billion in infrastructure on top of its normal annual capital investment program over the next ten years. 220 ILCS 5/16-108.5(b)(2) (West 2012). Under the Act the formula to establish rates enables ComEd to make planned substantial investment increases in its capital commitment by providing it with greater certainty of timely cost recovery than it would have received under previous rates.

¶ 6     To understand the issues in this case, it is necessary to first explain the Act's formula and define certain terms used under the Act and in rate-setting generally. We therefore explain these terms and then we summarize the procedural history and rulings in the 2011 rate case, which is the first rate case under the Act, as well as the issues now presented in this case, before providing our analysis and holding. We explain the revenue requirement formula and explain the terms common cost "allocation," "billing determinants," and "rate case expenses." The issues presented in this case regarding the Commission's 2012 rate update order concern billing determinants, allocation, and rate case expenses.

¶ 7                         Revenue Requirement Formula

¶ 8     The Act sets forth a performance-based formula to set a rate for electricity delivery services. See 220 ILCS 5/16-108.5(b) (West 2012). "The components of the revenue requirement have frequently been expressed in the formula 'R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' " *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991) (quoting *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988)).

¶ 9     In establishing the rates that a public utility can charge its customers, the Commission considers the company's operating costs, rate base, and allowed rate of return. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001) (citing *Citizens Utilities Co. of Illinois*, 124 Ill. 2d at 200).

¶ 10    In this formula the cost of capital equals the rate base times the rate of return on capital. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 122860, ¶ 3 (citing *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991)). The rate base is defined as the total value of all invested capital. *Id*. Invested capital includes investments in projected plant additions. The Commission practice in rate proceedings is to make adjustments to account for the effects of *pro forma* projected plant additions to the rate base.

¶ 11        "The rate of return is typically established with reference to what would be a reasonable return on the present value of a utility's property." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 515 (2009) (citing *Villages of Milford v. Illinois Commerce Comm'n*, 20 Ill. 2d 556, 562 (1960)). "The return is the product of the allowed rate of return and the rate base." *Commonwealth Edison Co.*, 322 Ill. App. 3d at 849 (citing *Citizens Utilities Co.*, 124 Ill. 2d at 200). The company's revenue requirement comprises the sum of operating costs and the return on the rate base. *Id.*

¶ 12                                                     Costs

¶ 13        The Act provides that participating utilities recover their prudent and reasonable "actual costs of delivery services." 220 ILCS 5/16-108.5(c)(1) (West 2012). These are the "operating costs" part of the revenue requirement formula.

¶ 14        The Act specifies many of the "cost components" that form the basis of the rate, including the "costs of delivery services that are prudently incurred and reasonable in amount consistent with Commission practice and law," year-end capital structure, cost of equity, incentive compensation expense,[1] and pension and other post-employment benefits expense and severance costs. 220 ILCS 5/16-108.5(c) (West 2012). Generally, a utility's costs are recoverable if they are reasonable and prudent. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 516 (2009) (citing *Business & Professional People for the Public Interest*, 146 Ill. 2d at 247). "[T]o be recoverable, in addition to being reasonable and prudent, a cost must also pertain to operations or service delivery ***." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 516 (2009).

¶ 15        The Act provides that a utility's costs shall include the "final data based on [the utility's] most recently filed [Federal Energy Regulatory Commission] FERC Form 1." 220 ILCS 5/16-108.5(c) (West 2012). The FERC regulates and has exclusive jurisdiction of interstate transmission of electricity, and it sets rates for the interstate transmission. See 16 U.S.C. § 824 (b)(1) (2012). The FERC Form 1 is an annual report filed by major private utilities with the FERC. Thus, the Commission bases a utility's costs, in part, on the "final historical data" of "the actual costs for the prior rate year" on the FERC Form 1. 220 ILCS 5/16-108.5(d)(1) (West 2012).

¶ 16        The Act requires that the rate formula "shall specify the cost components that form the basis of the rate charged to customers with sufficient specificity to operate in a standardized manner and be updated annually with transparent information that reflects the utility's actual costs to be recovered during the applicable rate year." 220 ILCS 5/16-108.5(c) (West 2012). The charges are to be "just and reasonable and shall take into account customer impacts." 220 ILCS 5/16-108(d) (West 2012).

¶ 17                                                  Allocation

¶ 18        ComEd uses its power lines to both distribute power to customers within Illinois and also to transmit electricity across state lines. Thus, its operating costs include costs that are common

---

[1]We do not discuss the "recovery of incentive compensation expense that is based on the achievement of operational metrics" (220 ILCS 5/16-108.5(c)(4)(A) (West 2012)), as ComEd withdrew its appeal of the Commission's ruling concerning this component of cost.

to both intrastate and interstate delivery of electricity. Common costs are costs that ComEd incurs for things that serve both interstate transmission and intrastate distribution, such as expenses for what are called "general plant" costs (*e.g.*, land, buildings, equipment and tools) and "intangible plant" costs (*e.g.*, incorporation and franchise fees), and real estate taxes. The interstate component is referred to as interstate "transmission" and the intrastate component is referred to as intrastate "distribution." The FERC regulates and has exclusive jurisdiction of interstate transmission of electricity (16 U.S.C. § 824(b)(1) (2012)), while the Commission regulates and has exclusive jurisdiction of intrastate distribution.

¶ 19    When ComEd incurs costs that relate to both its interstate transmission and intrastate distribution services, those costs must be "allocated" or "functionalized,"[2] meaning apportioned, between interstate transmission and intrastate distribution. These common costs must be allocated between federal and state costs so that an appropriate portion of each common cost is assigned to each jurisdiction to allow the regulator to set rates. Section 16-108.5(c)(4) directs the Commission to set protocols "for the allocation of common costs" using its traditional article IX general ratemaking authority. 220 ILCS 5/16-108.5(c)(4)(I) (West 2012). The Commission historically has exercised broad discretion in allocating common costs.

¶ 20    ComEd argues on appeal in this case that unless the federal and state costs are allocated using the same methodologies, some of the costs it incurs will not be allocated to either the federal jurisdiction (FERC) or the state jurisdiction (Commission), and therefore these costs will be unrecoverable from either the federal rate or the state rate. ComEd refers to such allegedly unrecoverable costs as "trapped" costs. There is, however, no requirement under either the Act or federal statute or regulations that the FERC and the Commission use the same methodologies in allocating costs.

¶ 21                          Billing Determinants

¶ 22    Billing determinants are not "costs" that ComEd has incurred; rather, they are measures of the quantity of customer demand for service used to set rates that will allow a utility to recover its revenue requirement. Once a utility establishes its revenue requirement, the utility must then spread the revenue requirement to several established classes of ratepayers, and set rates, based on historical data, that the utility expects to generate its required revenue. *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 3. To set the rates that would allow ComEd to recover its revenue requirement, the Commission must calculate the quantity of ComEd's services that customers will demand. A utility's revenues are a function of both unit rates, which is the price per kilowatt hour (kWh) of electricity delivered, and the quantity of services used (both the number of customers and the volume of kWh delivered to them). The greater the demand for and use of electricity, the lower the unit prices need to be in order for ComEd to realize its revenue requirement.

¶ 23    The Act specifically requires that as part of providing for the recovery of a utility's actual costs of delivery services, the Commission shall "[p]ermit and set forth protocols, subject to a determination of prudence and reasonableness consistent with Commission practice and law" for "historical weather normalized billing determinants." 220 ILCS 5/16-108.5(c)(4)(H) (West

---

[2]ComEd uses the terms "allocation" and "functionalization" and "allocating" and "functionalizing" interchangeably.

2012). Weather normalization is the process of accounting for any deviation between the historic year's temperature and normal temperatures.

¶ 24    Other billing determinants may be used to measure the quantity of customer demand, including new customer growth as the result of plant additions. The Commission is not limited to considering only "historical weather normalized billing determinants." Rather, the Act provides that the performance-based formula rate approved by the Commission shall "[p]rovide for the recovery of the utility's actual costs of delivery services that are prudently incurred and reasonable in amount consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(1) (West 2012). The Act is permissive in providing that the Commission shall "[p]ermit and set forth *protocols*" (emphasis added) for the historical weather normalized billing determinants. 220 ILCS 5/16-108.5(c)(4)(H) (West 2012). The Act does not limit billing determinants to only historical weather normalization.

¶ 25                                    Rate Case Expenses

¶ 26    Under the Act, the formula also includes as one of the cost components the "recovery of the expenses related to the Commission proceeding *** to approve th[e] performance-based formula rate" (220 ILCS 5/16-108.5(c)(4)(E) (West 2012)). The Act was amended, effective July 10, 2009, to add a provision specifically governing consideration of attorney fees and expert expenses as part of a utility's cost. See Pub. Act 96-33, § 10 (eff. July 10, 2009). Section 9-229 of the Act now requires that the Commission "specifically assess the justness and reasonableness of any amount expended by a public utility to compensate attorneys or technical experts to prepare and litigate a general rate case filing." 220 ILCS 5/9-229 (West 2012).

¶ 27                                      2011 Rate Case

¶ 28    "A rate case is started when a utility *** 'files tariffs providing for a rate increase and the Commission suspends those tariffs to conduct an investigation and hearing.' " *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 11 (quoting *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 394 (2010)). "The Commission may approve, reject, or modify the proposed tariffs. Section 9-201(c) of the Act provides that, if the Commission initiates a proceeding concerning the appropriateness of a utility's proposed rates, the utility has the burden of proving that the proposed rates are just and reasonable." *Commonwealth Edison*, 405 Ill. App. 3d at 394; see also 220 ILCS 5/9-201(c) (West 2010).

¶ 29    In 2011, ComEd chose to file a new rate tariff under the performance-based formula in the Act. The Illinois Attorney General, the American Association of Retired Persons (AARP) and the Citizens Utility Board (CUB) opposed parts of the proposed rate tariff and were allowed to intervene. The disputed issues centered on the reconciliation process, in particular about when to include new capital additions in the rate base and how much interest ratepayers should pay on the reconciliation amount. The Attorney General, AARP and CUB proposed an upward adjustment to ComEd's year-end 2010 billing determinants to account for the effect on billing determinants of customer growth from ComEd's inclusion of the new business component of its 2011 projected plant additions in rate base.

¶ 30    The Commission established the formula in the 2011 Rate Case. *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 11-0721 (Order May 29, 2012) (hereinafter, 2011 Rate Case). The Commission adopted ComEd's proposed protocols for weather normalized billing determinants. These protocols are the variables, models, and methodologies ComEd uses to modify certain billing determinants to reduce the impact of abnormal weather. The Commission has generally accepted ComEd's weather normalization protocols and did so in the 2011 Rate Case order. *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 11-0721 (Order May 29, 2012).

¶ 31    The Commission, however, concluded that ComEd's proposed rate failed to adjust the billing determinants to account for the effect of ComEd's 2011 projected new business plant additions on customer growth, which would allow for the recovery of more than the actual costs of delivery services, in contravention of section 16-108.5(c)(4)(1). The Commission found the Attorney General, AARP, CUB and its staff's proposal reasonable to ensure accurate billing determinants and permit ComEd to recover no more in revenue than that to which it is entitled under its revenue requirement. The Commission agreed that without an appropriate adjustment to the billing determinants to include new customer growth, ComEd would consistently earn more in revenue than its revenue requirement.

¶ 32    The Commission considered evidence and argument regarding a decline in kWh sales but rejected ComEd's argument to take into account this change in usage. The Commission concluded in its 2011 Rate Case order:

> "[A] decline in [kWh] sales, in and of itself, does not establish that there are less customers. It simply means that less electricity was sold. Other factors, such as energy efficiency, a bad economy, etc. may very well contribute to a decline in [kWh] sales. Without information as to what causes a decline in [kWh] sales, it does not appear that this decline should offset the increase in billing determinants that reflects ComEd's new business." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 11-0721, at 75 (Order May 29, 2012).

¶ 33    The Commission directed ComEd to take its 2010 year-end billing determinants and adjust them to reflect the estimated increase in customer bill count or new customer growth produced by the 2011 projected new business plant additions.

¶ 34    Regarding allocation, ComEd proposed to change its allocation method for general and intangible plant costs which would produce a net increase of approximately $18.2 million in net plant costs allocated to distribution, and result in a $2.171 million increase in its revenue requirement. ComEd also changed its allocation of real estate taxes, shifting $3.345 million in real estate taxes to intrastate distribution, instead of allocating this cost to interstate transmission. According to ComEd, its methodologies were consistent with the methodologies FERC had used in setting ComEd's interstate transmission rates. The methodologies the FERC used, however, were the ones urged by ComEd. The FERC did not determine these different methodologies.

¶ 35    The Commission, however, rejected these changes in allocation and reaffirmed ComEd's prior existing cost allocation methods which it had used in its most recent rate case prior to the 2011 Rate Case. In weighing ComEd's evidence, the Commission found that ComEd failed to demonstrate that a change from the existing, long-standing, Commission-approved just and reasonable cost allocation methodologies was warranted. The Commission found that ComEd failed to establish that its proposal was more accurate or just and reasonable than the existing

allocation, or necessary to align federal and state tariffs, or that there were any trapped costs. The Commission specifically found that ComEd presented no factual evidence to establish that costs were in fact being trapped between the FERC and the Commission's jurisdictions or to establish that it was necessary to align ComEd's FERC-filed tariff and its Commission-filed tariff in the manner ComEd proposed. ComEd claimed that, as a result of the Commission's ruling some of ComEd's costs were "trapped" and unable to be recovered.

¶ 36    ComEd appealed, challenging the following rulings by the Commission: (1) requiring an adjustment to rates charged to ComEd customers to reflect the expected increase in the number of customers served; (2) allocating certain general costs between distribution to ratepayers and transmission to out-of-state purchasers; (3) restricting ComEd's recovery from ratepayers for certain performance bonuses paid to ComEd employees; (4) denying ComEd recovery from ratepayers for part of the amount ComEd paid to an affiliate, which was used by the affiliate to give its employees bonuses based on net income; and (5) denying ComEd recovery from ratepayers for compensation paid to ComEd managers in the form of stock in ComEd's parent corporation. We recently issued an opinion rejecting ComEd's arguments and affirming the Commission's order. See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 122860.

¶ 37    In the 2011 Rate Case, ComEd had also challenged two other Commission rulings: (1) using an average rate base instead of a year-end rate base when calculating the reconciliation balance; and (2) applying an interest rate equal to ComEd's short-term debt rate rather than ComEd's weighted average cost of capital to the reconciliation balance. But these issues were resolved by legislative amendment in Public Act 98-15, which preempted and superseded those Commission orders. See Pub. Act 98-15, § 1 (eff. May 22, 2013). We noted this amendatory Act in our opinion in the 2011 Rate Case. See *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 49. These previous alleged errors are not at issue in this appeal.

¶ 38                                              2012 Rate Case

¶ 39    The Act requires that the formula "be updated annually with transparent information that reflects the utility's actual costs to be recovered during the applicable rate year." 220 ILCS 5/16-108.5(c) (West 2012). While the appeal of the 2011 Rate Case was pending, the Commission was required to continue to apply the formula in annual update proceedings. This case arises from the Commission's first update under that formula.

¶ 40    The final order by the Commission under review in this case (2012 Rate Case) was issued on December 19, 2012. In the 2012 Rate Case, ComEd was required to submit a rate filing that conformed with the Commission's order and rulings in the 2011 Rate Case. Accordingly, ComEd's filed rate reflected the "functionalization of plant between the transmission and distribution functions *** in conformance with the May 11-0721 Order," but ComEd stated in its brief before the Commission that by doing so it "did not change its position on the issues, nor did it waive any rights to pursue them currently or in the future." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 12-0321 (Order Dec. 19, 2012).

¶ 41    ComEd did not, however, adjust its 2011 year-end billing determinants to reflect the estimated increase in customers attributable to the 2012 projected new business plant additions. ComEd's position is that the 2011 Rate Case order was limited to that year, and that ComEd did not need to adjust its billing determinants for 2012 to reflect the estimated increase in customer bill count due to projected new plant additions. The Attorney General, AARP,

CUB and the Commission staff disagreed and recommended that the Commission adopt an upward adjustment to ComEd's 2011 billing determinants to reflect the 2012 projected new business plant additions, consistent with the approach in the 2011 Rate Case order. The Commission agreed and so ordered.

¶ 42 ComEd's tariff filing for 2012 measured its rate base as of December 31, 2011, and then increased that end-of-year figure by the amount of 2012 projected plant additions. One of the components of ComEd's total 2012 projected plant additions is for "New Business," which was estimated to be about $130 million and represents facilities to accommodate customer growth and includes equipment and line extensions to serve new residential and commercial development.

¶ 43 In ComEd's application for rehearing, ComEd requested that the Commission correct the 2012 order's revenue requirement and rates to allocate ComEd's assets and costs consistently with federal law and with the allocation approved by the FERC. The application for rehearing was denied. ComEd then filed a timely notice of appeal and petition for review with this court. On February 14, 2013, the Commission issued an amendatory order, and ComEd filed a notice of appeal and petition for review of that amendatory order. We granted a motion to consolidate the appeals.

¶ 44                                                ANALYSIS

¶ 45 In this 2012 rate update case, ComEd seeks review of three issues: (1) the billing determinants; (2) the allocation of certain common costs that ComEd incurs in connection with its interstate transmission service and its intrastate distribution or local delivery service (which is regulated by the Commission); and (3) the denial of ComEd's 2011 Rate Case expenses, such as the legal fees incurred in making its rate case filings, as not reasonable. The first two issues involve the same alleged formula errors as alleged in the 2011 Rate Case. ComEd argues those "errors" recurred in this case, as the Commission again applied those same aspects of the formula rate. The third issue is raised for the first time. ComEd also initially sought review of the Commission's treatment of incentive compensation, arguing that the Commission used a legally erroneous standard, but in its reply brief ComEd withdraws its request for review of this issue because ComEd concedes that the Commission allowed ComEd's requested compensation expense and thus ComEd was not harmed.

¶ 46 "When reviewing the Commission's orders, we are limited to considering whether (1) the Commission acted within its authority; (2) adequate findings were made to support the decision; (3) the decision was supported by substantial evidence; and (4) state or federal constitutional rights were infringed." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001) (citing *Citizens United for Responsible Energy Development, Inc. v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 89 (1996)). " 'Substantial evidence' means more than a mere scintilla; however, it does not have to rise to the level of a preponderance of the evidence." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009) (citing *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997)). "It is evidence that a 'reasoning mind would accept as sufficient to support a particular conclusion.' " *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d at 514 (quoting *Citizens Utility Board*, 291 Ill. App. 3d at 304).

¶ 47    The Act sets forth our standard of review: "The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10-201(d) (West 2012). See also *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 6 ("The Commission's factual findings are to be 'considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant.' " (quoting *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009))).

¶ 48    "Our courts give great deference to the Commission's decisions as they are ' "judgment[s] of a tribunal appointed by law and informed by experience." ' " *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001) (quoting *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994), quoting *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960)). The Commission is entitled to great deference from a reviewing court because it is an administrative body possessing expertise in the field of public utilities. *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397 (1998). "Our supreme court has held that deference to the Commission is 'especially appropriate in the area of fixing rates.' " *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514 (quoting *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960)). When reviewing an order from the Commission, we therefore give deference to the Commission's decision, in light of its expertise and experience in this area. *Commonwealth Edison Co.*, 398 Ill. App. 3d at 514.

¶ 49                                      Billing Determinants

¶ 50    The Commission argues that our previous decision in *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, regarding the 2011 Rate Case is dispositive of the first two issues on appeal, including the first issue concerning billing determinants. ComEd, however, argues that our decision in *Commonwealth Edison Co.* was "based upon a different evidentiary record, a different Commission Order, and different arguments by the Commission in defense of that Order."

¶ 51    *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, involved Commission order No. 11-0721 for ComEd's 2011 Rate Case, which presented issues as to ComEd's formula rate for 2011. The present appeal involves Commission order No. 12-0321 for ComEd's 2012 Rate Case, which presents issues as to ComEd's formula rate reconciliation for 2012. ComEd's position was that the Commission's order in the 2011 Rate Case to adjust ComEd's billing determinants to reflect the estimated increase in customers attributable to the 2011 projected new business plant additions should not operate beyond the 2011 Rate Case order. The Attorney General, AARP, CUB, and the Commission's staff disagreed and recommended that the Commission adopt an upward adjustment or reconciliation to ComEd's 2011 weather-normalized billing determinants to reflect the 2012 projected new business plant additions. The Commission agreed and held that the same billing determinants approach used in the 2011 Rate Case should be used in this case. The Act specifies that the Commission may not, in a rate update proceeding, "consider or order any changes to the structure or protocols of the performance-based formula rate approved" in an order by the Commission. 220 ILCS

- 10 -

5/16-108.5(d) (West 2012). Thus, in the 2012 update proceeding, the Commission could not consider any changes to the structure or protocols it had already approved in the 2011 Rate Case order.

¶ 52 ComEd does not argue there was an error in the update aspect of this 2012 Rate Case. Instead, ComEd argues, as it did in the 2011 Rate Case, that the Commission erred in its approved formula rate and violated section 16-108.5(c)(4)(H) because the Act only allows "historical weather normalized billing determinants," and "removes from the Commission any discretion" to apply any other billing determinants, including customer growth due to plant additions. ComEd also argues the Commission's adjustment to reflect projected new business plant additions, as it also approved in the 2011 Rate Case, is arbitrary and capricious because the Commission did not also consider other variables that would affect consumer demand. The Commission replies that our decision in the 2011 Rate Case controls determination of these issues.

¶ 53 We agree with the Commission. These legal issues have already been determined by this court and relitigation is barred by collateral estoppel. "Collateral estoppel is a branch of *res judicata* that prohibits the relitigation of an issue actually decided in an earlier proceeding between the same parties." *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 17 (citing *Mabie v. Village of Schaumburg*, 364 Ill. App. 3d 756, 758 (2006)). Collateral estoppel, or issue preclusion, is "much narrower" than *res judicata*, however, "in that it prevents relitigation of issues of law or fact that have previously been litigated and decided in an action that resulted in a final judgment on the merits involving the same parties or their privies." *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 21 (citing *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001), *Schratzmeier v. Mahoney*, 246 Ill. App. 3d 871, 875 (1993), and *Dowrick v. Village of Downers Grove*, 362 Ill. App. 3d 512, 515-16 (2005)). "While *res judicata* bars subsequent actions involving *identical* causes of action, the related doctrine of collateral estoppel prevents relitigation of issues decided in earlier proceedings." (Emphasis added.) *Diotallevi v. Diotallevi*, 2013 IL App (2d) 111297, ¶ 21 (citing *Dowrick v. Village of Downers Grove*, 362 Ill. App. 3d 512, 516 (2005)).

¶ 54 "The doctrine applies when a party participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former case by a court of competent jurisdiction." (Emphasis omitted.) *People v. Hopkins*, 235 Ill. 2d 453, 468 (2009) (citing *People v. Tenner*, 206 Ill. 2d 381, 396 (2002), and *People v. Moore*, 138 Ill. 2d 162, 166 (1990)). "[F]or collateral estoppel to apply: (1) the issue decided in the prior proceeding must be identical to the one in the current suit; (2) the prior adjudication must have been a final judgment on the merits; and (3) the party against whom the estoppel is asserted must have been a party to, or must be in privity with a party to, the prior adjudication." *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 77 (citing *In re A.W.*, 231 Ill. 2d 92, 99 (2008)).

¶ 55 Here, collateral estoppel applies to the first two issues raised by ComEd on appeal to the extent ComEd makes the same arguments raised in the 2011 Rate Case. We note that this 2012 Rate Case is not an identical cause of action as the 2011 Rate Case. Rather, this 2012 Rate Case is a rate update case. The Act requires that the formula "be updated annually with transparent information that reflects the utility's actual costs to be recovered during the applicable rate year." 220 ILCS 5/16-108.5(c) (West 2012). This 2012 Rate Case thus applies the same

approved formula from the 2011 Rate Case but, because it is an annual update, the actual costs and the resulting rate is different. ComEd again raises the same legal issue concerning billing determinants addressed by this court in our opinion in the 2011 Rate Case, where we determined that the Act does not limit the Commission in rate-setting to only weather normalized billing determinants. In our opinion in the 2011 Rate Case, we acknowledged that while "[t]he Act does not specifically mention adjustments to performance-based rates for expected changes in the number of customers, usage, or any other determinant of total sales, apart from weather normalization" (*Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 56), as the Commission's staff pointed out, the Act directs the Commission to determine rates " 'subject to a determination of prudence and reasonableness consistent with Commission practice and law.' " *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 57 (quoting 220 ILCS 5/16-108.5(c)(4) (West 2012)). We explicitly held that the Commission could use projected new business plant additions, in addition to normalized weather billing determinants, and that ComEd failed to show that the Commission violated the Act when it required an adjustment to ComEd's rates to take into account expected growth in the number of customers it served. *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 57. We reiterate our prior holding. We underscore the fact that the Act is permissive in providing that the Commission shall "[p]ermit and set forth *protocols*" (emphasis added) for the historical weather normalized billing determinants. 220 ILCS 5/16-108.5(c)(4)(H) (West 2012). The Act does not limit billing determinants to only historical weather normalized billing determinants. This precise issue was already decided and ComEd is barred from relitigating it.

¶ 56 Our decision in the 2011 Rate Case also controls the related billing determinant legal issue of whether the Commission is also required to take into account other customer usage factors in establishing the appropriate rate and, in turn, ComEd's revenue requirement. In our opinion in the 2011 Rate Case, we also held that the Commission was not required to take into account any other factors as billing determinants, such as an alleged decline in kWh usage, and that ComEd failed to establish what the cause was for the decline in kWh usage. We held that ComEd did not meet its burden of showing that the Commission's finding was contrary to the manifest weight of the evidence, or that the Commission acted unreasonably when it ordered an adjustment to rates to account for the expected increase in the number of customers. *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 58.

¶ 57 Thus, our opinion deciding the 2011 Rate Case settled the legal issues that the Commission can use projected new business plant additions in establishing ComEd's rate, and the Commission is not required to also account for usage without any proof of what the cause is for the change in usage.

¶ 58 As to the factual findings specific to the 2012 Rate Case, as we have set forth above in our standard of review, the Commission's findings are *prima facie* true and correct and it is ComEd's burden on appeal to rebut that presumption. The Act provides: "The performance-based formula rate approved by the Commission shall" "[p]ermit and set forth protocols, subject to a determination of prudence and reasonableness consistent with Commission practice and law, for *** historical weather normalized billing determinants." 220 ILCS 5/16-108.5(c)(4)(H) (West 2012). The Act also directs the Commission to determine rates "subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(4) (West 2012).

¶ 59    In the 2011 Rate Case, we found, based on the evidentiary record before the Commission in that case, that the Commission's "factual finding that ComEd did not show a cause for the decrease, and the Commission could not project on the basis of ComEd's data whether ComEd would likely experience further declines in sales per customer" was not against the manifest weight of the evidence. *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 58.

¶ 60    Similarly here, although we acknowledge that this is a separate case and separate proceeding with a different record, the evidentiary record similarly lacks support for ComEd's contention that the Commission erred in not considering the future decline in kWh usage. The Commission did not "refuse" to consider ComEd's alleged future changes in kWh sales. The Commission again considered ComEd's evidence and argument regarding a decline in kWh sales. And ComEd again could not show what the cause was or would be for any decline in usage and the Commission again could not project on the basis of ComEd's data whether ComEd would likely experience future declines in kWh usage per customer. The Commission found: "In this proceeding, ComEd provides no evidence indicating why there is a decline in usage." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 12-0321, at 28 (Order Dec. 19, 2012) The Commission reasoned that, "[a]s the customer base of the billing determinants equation is a 'fixed charge,' it is appropriate to insure that the customer base component is accurate and accounts for expected customer growth so that customers are not charged an inflated rate." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 12-0321, at 28 (Order Dec. 19, 2012).

¶ 61    ComEd's argument ignores the fact that the Commission had previously set rates by recognizing both growth in the number of customers and an increase in kWh sales. In this case, the Commission did not also find any projected increase in kWh sales but, rather, only an increase in the number of customers due to the plant growth projection. But, because there was insufficient evidence regarding the decline in kWh sales, the Commission could not definitively find a decline in kWh sales such that the formula rate should be impacted. The Commission concluded as follows:

> "Mr. Effron did not recommend increasing the total amount of kWh sales billing determinants in light of the overall decline in ComEd's total kWh sales. *** While the Commission has previously recognized growth in both the number of customers and kWh sales, such a determination is inappropriate in this proceeding based on record evidence. There is insufficient evidence in this proceeding to find that a decline in kWh sales affects the number of customers amongst whom the revenue requirement should be spread, and as such there is insufficient evidence to determine that this decline should offset the increase in billing determinants that reflects New Business." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 12-0321, at 29-30 (Order Dec. 19, 2012).

¶ 62    On this point, the Commission appropriately considered only the increase in the number of customers, as ComEd failed to provide enough information on a decrease in kWh usage to change the rate formula. We affirm the Commission's order regarding billing determinants in setting ComEd's rate.

¶ 63                                    Cost Allocation

¶ 64    ComEd next argues that the Commission erred in its order in this rate case because it continues to refuse ComEd's proposed new allocation methodologies from the 2011 Rate

- 13 -

Case. In the 2011 Rate Case, ComEd proposed new methodologies for allocating two categories of shared costs: general and intangible plant costs; and real estate taxes. According to ComEd, its methodologies were consistent with the methodologies the FERC had used in setting ComEd's interstate transmission rates and would have resulted in the appropriate recovery of the full amount of its reasonable and prudent intrastate distribution costs. But, according to ComEd, the Commission rejected ComEd's methodologies and adopted methodologies inconsistent with the FERC's which resulted in some of its costs being "trapped" and unrecoverable because the FERC ruled that certain costs could not be allocated to interstate transmission, and the Commission ruled that those costs could not be allocated to intrastate distribution either. In this 2012 Rate Case, ComEd was required to submit a rate filing that conformed with the Commission's allocation rulings in the 2011 Rate Case. ComEd again argues that the Commission's methodology for allocating certain costs to intrastate distribution violated federal and state law.

¶ 65    As in the 2011 Rate Case, ComEd again reiterates the same arguments regarding allocation: (1) that the Commission is required to follow the FERC's allocation methodologies under Illinois law, specifically that section 16-108(c) of the Act (220 ILCS 5/16-108(c) (West 2012)) requires the Commission to set rates that will allow ComEd to fully recover *all* costs related to both interstate transmission and intrastate distribution; and (2) that the federal constitution's supremacy clause and the filed rate doctrine bar the Commission from allocating common costs in a manner inconsistent with the FERC's allocation.

¶ 66    We note at the outset that in our decision in the 2011 Rate Case, in addressing these same allocation arguments, we held generally that ComEd "has not met its burden of proving that the Commission violated either federal or state law or acted unreasonably in its allocation of general wages and plant costs [and] real estate taxes." *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 61. Thus, to this extent, relitigation of the general issue of allocation is barred by collateral estoppel.

¶ 67    To the extent that the specific arguments under state and federal law may not have been actually addressed in our previous opinion in *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, because ComEd is raising them again, we address them here. These specific arguments concern: (1) section 16-108(c) of the Act; and (2) federal preemption and the filed rate doctrine.

¶ 68    First, ComEd's reliance on section 16-108(c) not only is not on point for the formula rate, but ComEd also does not include the full text of that provision, misleadingly suggesting that section 16-108(c) requires the Commission to allow a utility to recover *all* the costs of providing delivery services in whatever manner suggested by the utility. This is not the case. The full text of section 16-108(c) provides as follows:

> "(c) The electric utility's tariffs shall define the classes of its customers for purposes of delivery services charges. Delivery services shall be priced and made available to all retail customers electing delivery services in each such class on a nondiscriminatory basis regardless of whether the retail customer chooses the electric utility, an affiliate of the electric utility, or another entity as its supplier of electric power and energy. Charges for delivery services shall be cost based, and *shall allow the electric utility to recover the costs of providing delivery services through its charges to its delivery service customers that use the facilities and services associated with such costs*. *Such costs shall include the costs of owning, operating and maintaining*

- 14 -

*transmission and distribution facilities. The Commission shall also be authorized to consider whether, and if so to what extent, the following costs are appropriately included in the electric utility's delivery services rates*: (i) the costs of that portion of generation facilities used for the production and absorption of reactive power in order that retail customers located in the electric utility's service area can receive electric power and energy from suppliers other than the electric utility, and (ii) the costs associated with the use and redispatch of generation facilities to mitigate constraints on the transmission or distribution system in order that retail customers located in the electric utility's service area can receive electric power and energy from suppliers other than the electric utility. *Nothing in this subsection shall be construed as directing the Commission to allocate any of the costs described in (i) or (ii) that are found to be appropriately included in the electric utility's delivery services rates to any particular customer group or geographic area in setting delivery services rates*." (Emphases added.) 220 ILCS 5/16-108(c) (West 2012).

¶ 69 The Act specifies that the formula rate shall be computed based on a utility's actual cost, as reported to the FERC on FERC Form 1 for the prior year:

>"The utility shall file, together with its tariff, final data based on its most recently filed FERC Form 1, plus projected plant additions and correspondingly updated depreciation reserve and expense for the calendar year in which the tariff and data are filed, that shall populate the performance-based formula rate and set the initial delivery services rates under the formula." 220 ILCS 5/16-108.5(c) (West 2012).

¶ 70 Thus, the actual costs reported to the FERC the prior year are used by the Commission to set the revenue requirement for participating utilities under the Act. See 220 ILCS 5/16-108.5(d)(1) (West 2012). ComEd does not explain how or why this actual cost reporting mechanism to set rates is inadequate, and why the Commission would have to take the additional step of ensuring its allocation methodologies are exactly the same as the ones used by the FERC.

¶ 71 Section 16-108.5(c) further provides: "Nothing in this Section is intended to allow costs that are not otherwise recoverable to be recoverable by virtue of inclusion in FERC Form 1." 220 ILCS 5/16-108.5(c) (West 2012). Thus, the Commission is not required to allow costs solely because the costs are included at the FERC.

¶ 72 ComEd's assertion that "the Commission has little discretion with respect to functionalizing common costs" is squarely refuted by the Act. Rather, the Act directs the Commission to determine rates "subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(4) (West 2012). Section 16-108.5(c)(4)(I) unequivocally directs the Commission to set forth protocols, consistent with its own practice and law, regarding the allocation of common costs:

>"(c) *** The performance-based formula rate approved by the Commission shall do the following:
>
>      * * *
>
> (4) Permit and set forth protocols, subject to a determination of prudence and reasonableness consistent with Commission practice and law, for the following:
>
>      * * *
>
>  (I) allocation methods for common costs." 220 ILCS 5/16-108.5(c)(4)(I)

(West 2012).

¶ 73     This is what the Commission did; it set the allocation method consistent with Commission practice from the prior year's order. ComEd does not dispute that the Commission's allocation was consistent with its previous allocation.

¶ 74     ComEd also reiterates its second allocation argument in this case that under the United States Constitution's supremacy clause and the filed rate doctrine, the Commission may not allocate costs or set rates in a manner that is inconsistent with the FERC's cost allocations and rates, citing to *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 964-66 (1986), *Mississippi Power & Light Co. v. Moore*, 487 U.S. 354, 371-73 (1988), *Entergy Louisiana, Inc. v. Louisiana Public Service Comm'n*, 539 U.S. 39, 47 (2003), and *General Motors Corp. v. Illinois Commerce Comm'n*, 143 Ill. 2d 407, 420 (1991). According to ComEd's brief on appeal before this court, "when [the] FERC has issued a Transmission Formula Rate ('TFR') that allocates a certain portion of common costs to transmission, then the Commission *must* allocate the remaining portion of those costs to distribution," so no costs could possibly be trapped. (Emphasis in original.)

¶ 75     We clarify that the filed rate doctrine does not stand for the broad proposition stated by ComEd and is not applicable in this case. The filed rate doctrine is a doctrine that merely holds that a state agency cannot disallow recovery of FERC-approved federal costs from ratepayers. The FERC has exclusive jurisdiction over rates to be charged electric utility's interstate wholesale customers. 16 U.S.C. § 824(b) (2012). Pursuant to the filed rate doctrine, the Commission is preempted from disallowing FERC-approved costs from ratepayers. "[A] state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price." *Nantahala*, 476 U.S. at 965. Once the FERC files a rate, that rate must be passed through to ratepayers and state agencies cannot disallow this cost. The filed rate doctrine concerns only the passing through of federal costs to retail rates. It operates as a bar against state agencies "trapping" only federal wholesale costs by disallowing recovery of FERC-approved costs from ratepayers. As the United States Supreme Court explained, "a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate." *Nantahala*, 476 U.S. at 970. See also *General Motors Corp.*, 143 Ill. 2d at 420 (explaining that the filed rate doctrine "protects distributors from the trapping of wholesale costs"). The Court pointed out however, as many filed rate doctrine cases have observed, that "an increase in FERC-approved wholesale rates need not lead to an increase in retail rates" because the company may experience savings in other areas which offset this FERC rate increase. *Nantahala*, 476 U.S. at 967.

¶ 76     The filed rate doctrine does not stand for the proposition that a state agency must approve all remaining costs beyond FERC interstate transmission costs and allocate these costs to intrastate distribution, as argued by ComEd. As explained by the Commission, the FERC-approved transmission costs are set forth in FERC-approved rates and FERC-filed tariffs, which are in fact already "passed through" to ComEd's customers through a separate line-item charge on their monthly bills. ComEd makes no reply to this fact. The filed rate doctrine was not violated by the Commission and simply is not implicated here.

¶ 77     As the Commission argues, the cases cited by ComEd are distinguishable because they involve passing the cost of wholesale power through to retail rates to allow a distributor to recover its federal wholesale costs, and not the allocation of costs between transmission and

distribution. None of ComEd's citations involve allocation of interstate and intrastate delivery costs within the same utility company.

¶ 78　　We further determine and highlight the fact that the different allocation methodologies were a result of ComEd's own choice. ComEd argues we must give deference to the FERC's allocation methodologies pursuant to the Supremacy Clause of the United States Constitution, but in fact ComEd urged those methodologies at the FERC. In our decision in the 2011 Rate Case, where ComEd first urged the change in allocation methodology, we noted evidence by ComEd that it filed documents with the FERC in which ComEd allocated a greater percentage of its costs of general wages and plant, including real estate taxes, to distribution, thereby reducing the price for the electricity ComEd sold to out-of-state purchasers. *Commonwealth Edison Co.*, 2014 IL App (1st) 122860, ¶ 61. Thus, ComEd sought the different methodology with the FERC for allocating interstate transmission costs. As the Commission points out, ComEd was well aware of the existing allocation methodology for rate-setting with the Commission. As the Commission aptly argues:

"That ComEd elected to urge an allegedly different cost allocation method at the FERC to allocate transmission costs attributable to the interstate jurisdiction does not control or otherwise limit the Commission's authority to independently establish the portion of common costs attributable to the Illinois jurisdiction. If ComEd had concerns that allegedly incompatible cost allocation methods would not allow it to fully recover costs allocated between the two regulatory jurisdictions, then it should have applied its long-standing Commission-approved cost allocation methodologies to allocate interstate transmission costs in proceedings at the FERC."

¶ 79　　ComEd itself could have ensured consistent methodologies by urging methodologies with the FERC that were consistent with the Commission's methodologies instead of urging the adoption of different methodologies. We thus clarify that we reject ComEd's claim of error by the Commission as a result of ComEd's own selection of methodologies it urged with the FERC for allocation of common costs.

¶ 80　　To the extent that ComEd argues that error in allocation methodologies is shown based on a different record in this case, litigation of the allocation issue is not barred; however, we hold that ComEd has again failed to sustain its burden of proving the Commission's findings and determination were in error. Though ComEd repeatedly reiterates that some of its general and intangible plant costs and real estate tax costs are "trapped," ComEd still does not shed light on the amount of those trapped costs. The Commission rejected ComEd's proposal to use the "wages and salaries" allocator for general and intangible plant costs, as ComEd had urged the FERC to adopt in its operative transmission formula rate. Under the wages and salaries allocator, the percentage of total wages going to personnel providing and supporting interstate transmission services versus intrastate distribution services is analyzed. Instead, according to ComEd, the Commission "used several different methodologies for allocating different aspects of G&I Plant." In its briefing on appeal in this case ComEd does not explain the various methodologies used by the Commission for general and intangible plant costs and instead cites to the Commission's order in the 2011 Rate Case. The Commission's 2011 Rate Case order explained that the current allocation approach was a combination of general functional allocators and direct assignment, but ComEd proposed to use a single generic functional allocator based on wages and salaries, allegedly to be consistent with the FERC. The Commission noted however, as argued by the CUB and the City of Chicago, that ComEd relied

on two FERC decisions from 1978 and 1988 and that "there is no change with respect to the FERC that might have arisen since the Commission's decision in Docket 10-0467 that would justify a substantial increase in the distribution revenue requirement under the Formula Rate Plan." The Commission found that "ComEd points to no fact in its argument indicating that there actually is such a 'trapping' between the two jurisdictions." ComEd again provides no information regarding what the amount of allegedly trapped costs is or, indeed, if there is *any* difference in general and intangible plant costs under the differing allocation analyses.

¶ 81 Regarding real estate taxes, the Commission rejected ComEd's proposal to use a "net plant allocator," as the FERC had done, adopting the proposed method of ComEd. The net plant allocator, according to ComEd, reflects the relative levels of investment in interstate transmission versus intrastate distribution. Instead, the Commission used the prior method of allocating real estate taxes based on an analysis of ComEd's expenditures on general communication equipment. This was the method previously endorsed by ComEd. ComEd does not provide any dollar amount "trapped" figure or even a purported percentage of allegedly "trapped" costs. Regarding support in the record, ComEd again merely cites to the Commission's order in the 2011 Rate Case. But the Commission's order recites that, based on ComEd's own review of the prior allocation methodology for real estate taxes in the 2010 rate case (Docket No. 10-0467), it "proposed a refinement in the methodology that better syncs with FERC and provides a more reasonable portrayal of the overall relationship between the investment made in transmission and distribution." There is no indication of any actual calculation or proof of any alleged trapped costs. At best, we merely have ComEd's assertion that it now believes differing methodologies for the allocators are better.

¶ 82 We cannot discern if *any* amount of costs is "trapped" as ComEd argues. We will not scour the record to attempt to find what those costs are. The appellant "has the burden of showing error; any doubt arising from incompleteness of the record will be resolved against the appellant." *People v. Kirkpatrick*, 240 Ill. App. 3d 401, 406 (1992). ComEd has utterly failed to sustain its burden on appeal. We therefore affirm the Commission's order.

¶ 83 <center>2011 Rate Case Expenses</center>

¶ 84 Finally, ComEd argues that the Commission erred in not granting its attorney fees and expenses for the 2011 Rate Case as one of its costs in the rate formula under the Act in this rate case. Except for $200,000 paid as a statutory filing fee, the entirety of ComEd's 2011 Rate Case expenses, $1,544,161, was disallowed. As this issue concerns the fees and expenses for the 2011 Rate Case, we are addressing this issue for the first time.

¶ 85 "Illinois courts have allowed utilities to recover rate case expense because '[t]he costs incurred by a utility to prepare and present a rate case are properly recoverable as an ordinary and reasonable cost of doing business.' " *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, ¶ 13 (quoting *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 432 (1993), citing *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550 (1971)). Section 16-108.5(c)(4)(E) provides that rate case expenses are properly recoverable through the EIMA performance-based formula rate and that the Commission is empowered to:

> "(4) Permit and set forth protocols, subject to a determination of prudence and reasonableness consistent with Commission practice and law, for the following:

(E) recovery of the expenses related to the Commission proceeding under this subsection (c) to approve this performance-based formula rate and initial rates or to subsequent proceedings related to the formula, provided that the recovery shall be amortized over a 3-year period; recovery of expenses related to the annual Commission proceedings under subsection (d) of this Section to review the inputs to the performance-based formula rate shall be expensed and recovered through the performance-based formula rate[.]" 220 ILCS 5/16-108.5(c)(4)(E) (West 2012).

¶ 86    Pursuant to section 16-108.5(c)(4)(E), ComEd requested that it be allowed to recover $1,544,161 for expenses in the 2011 Rate Case. Section 9-229 of the Act now requires that the Commission "specifically assess the justness and reasonableness of any amount expended by a public utility to compensate attorneys or technical experts to prepare and litigate a general rate case filing." 220 ILCS 5/9-229 (West 2012). In interpreting this relatively new section of the Act, in *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776, we held that, while the Commission previously only needed to make sufficient findings to allow for informed judicial administrative review under section 10-201(e)(iii) (220 ILCS 5/10-201(e)(iii) (West 2008)), section 9-229 created a requirement for more specific findings. We held that by requiring the Commission to "specifically assess the justness and reasonableness" of "any amount" paid by a utility for legal and expert fees and to "expressly address" this issue in its order, the Act mandated a more detailed finding than what was previously generally required of the Commission. (Internal quotation marks omitted.) *People ex rel. Madigan*, 2011 IL App (1st) 101776, ¶ 47.

¶ 87    ComEd argues, however, that in *Madigan* this court "did not identify what evidence would be sufficient to satisfy the evidentiary standard." This argument is not well-grounded. The Commission's order in this 2012 Rate Case also did not adopt a "new" or "erroneous" evidentiary standard as ComEd contends. Both a prior order by the Commission in another rate case in which ComEd was a party and the decision by this court in *People ex rel. Madigan* provided the applicable standard. To this point, we quote at length the Commission's detailed explanation of the evidentiary standard regarding approval of rate case legal fees and expenses as follows:

"In Docket 10-0467, a ComEd rate case, the Commission addressed the issue of what evidence satisfies the requirements in Section 9-229 of the Public Utilities Act. This Commission concluded that the parties should adhere to the well-established body of case law on the subject, which, very generally, requires proof of what services were performed, the necessity for those services, and proof that the rates at issue for the services are reasonable for the services performed. The Commission also concluded that a rulemaking should commence, which should have placed all concerned parties, including ComEd, 'on the same page' regarding that body of law. In that rulemaking proceeding, an extensive amount of information as to the documentation that is required by the body of law that was cited in the Docket 10-0467 Order was provided to all of the parties, including ComEd. Docket 10-0467, Final Order of May 24, 2011 at 81-86; Docket 11-0711, generally, regarding the rulemaking and regarding what that body of law requires.

With regard to attorney's fees, in that Order the Commission noted that accountants do not necessarily know what lawyers do or should be doing on behalf of their clients.

Docket 10-0467, final Order of May 24, 2011, at 81. This determination on the part of the Commission should have made it obvious to all of the parties, including ComEd, that merely tendering information in discovery, but not placing it in the evidentiary record, does not satisfy the legal requisites in the applicable body of law regarding attorney's fees. Tr. 129. This is true because when there is no evidence of record, the Commission has no evidence upon which it can determine that the rate case expenditures were just and reasonable, as required by Section 9-229 of the Public Utilities Act.

Subsequent to the final Order in Docket 10-0467, on December 9, 2011 the Illinois Appellate Court ruled in a matter involving another utility that, in order to satisfy Section 9-229 of the Act, the party seeking attorney's fees and expert witness fees must provide evidence that specifies: (1) the services performed; (2) by whom they were performed; (3) the time expended; and (4) the hourly rate charged. In that decision, the Illinois Appellate Court cited the very same body of case law that the Commission Order in Docket 10-0467 referred to above. The Appellate Court then remanded the matter to the Commission for a determination based upon these criteria. *People ex. rel. Madigan v. Illinois Commerce Comm.*, 2011 Ill. App. (1st) 101776, at 24-26 *** (Ill. App. 1st Dist. 2011) [*sic*]. At that point in time, this Commission became required to follow the body of law cited in the Appellate opinion and in the final Order in Docket 10-0467 [footnote 9] Notably, even a cursory examination of the body of case law cited in the final Order in Docket 10-0467 and in *People ex. rel. Madigan*, cited above, would reveal that what is necessary to satisfy that body of law is evidence as to what the lawyers and expert witnesses did, in the case file, for the trier of fact to view, in order to make a decision based on that evidence. *See, e.g.*, *City of Chicago v. Ill. Commerce Comm.*, 187 Ill. App. 3d 468, 469-472 *** (1st Dist. 1989); *Johnson v. Thomas*, 342 [I]ll. App. 3d 382, 400-404 *** (1st Dist. 2003); *Guerrant v. Roth*, 334 Ill. App. 3d 259, 267-73 *** (1st Dist. 2002); *Watson v. South Shore Nursing and Rehabilitation Center*, 2012 IL App (1st) 103730, 12-14 ***." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket No. 12-0321, at 53-54 (Order Dec. 19, 2012).

¶ 88    The Commission also noted in its order, in footnote 9, that "[o]f course, even before the Appellate Court decision, the attorneys were required to follow the very specific requirements in the code of ethics for attorneys. *See*, S. Ct. Rule 1.5." Rule 1.5 of the Illinois Rules of Professional Conduct of 2010 provides, in relevant part, the following:

"(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client." Ill. R. Prof. Conduct (2010) R. 1.5 (eff. Jan. 1, 2010).

¶ 89    Thus, even before the decision in *People ex rel. Madigan*, the Illinois Supreme Court Rules of Professional Conduct set forth factors concerning what would be considered in determining the reasonableness of attorney fees, including the time and labor required and the fee customarily charged in the locality for similar legal services.

¶ 90    Instead of following the guidance that was provided by both the Commission and this court regarding the inclusion of fees in setting the revenue requirement and rate, ComEd apparently approached the proceedings in this 2012 Rate Case as "business as usual," when both the Commission and this court have clearly stated otherwise.

¶ 91    ComEd's evidence in support of its 2011 Rate Case legal expenses consisted entirely of the testimony of Martin Fruehe, the manager of ComEd's revenue policy department and a one-page spreadsheet showing $1,979,831 in expenses for the 2011 Rate Case, adjusted to exclude $410,000 as a year-end accrual to be amortized and reflected in ComEd's 2012 reconciliation case, which then yielded $1,544,161, or $523,633 amortized over a three-year period. The spreadsheet indicated only totals and various entities. Regarding the spreadsheet, the Commission found as follows:

"[T]he evidence that ComEd presented regarding the amount of rate case expense that it is requesting, $1,544,161, is a scant one-page spreadsheet that merely lists totals and various entities. ComEd. Ex. 3.9. There is no proof as to what these entities did to earn their fees, and no proof as to what time was expended, or as to the rates charged consumers for various persons or entities, not to mention the reasonableness of those rates. This document does not even mention what law firms were paid. In fact, this document does not even establish that the services were performed in conjunction with any particular proceeding. *Id.*, Tr. 165-66166. There are no invoices in the record from any of the entities on ComEd Ex. 3.9. Tr. 166.

* * *

The Commission additionally notes that it appears that several of the items listed on ComEd Ex. 3.9 appear to be improperly included overhead expenses. *** Overhead costs, generally, are not recoverable under the body of case law concerning expert witness fees and attorney's fees that govern here. *Johnson v. Thomas*, 342 Ill. App. 3d 382, 402-04 *** (1st Dist. 2003), noting that routine charges are included in overhead and therefore not recoverable as a cost of litigation; *see also Harris Trust & Savings Bank v. American National Bank & Trust Co.*, 230 Ill. App. 3d 591, 599 *** (1st Dist. 1992). In fact, ComEd Ex. 3.9 does not state what services were performed by these entities ***." *Commonwealth Edison Co.*, Ill. Com. Comm'n, Docket 12-0321, at 54-57 (Order Dec. 19, 2012).

¶ 92    The Commission found that the only evidence regarding the rate case expenses was Fruehe's testimony, but the Commission found that Fruehe's testimony "does not even approach establishing the justness and reasonableness of the $1,544,161 of fees that ComEd seeks to include in rates."

¶ 93    We agree. Fruehe testified that ComEd reviewed each invoice that it received for the amounts listed on the spreadsheet for accuracy and reasonableness. Fruehe testified that in his opinion ComEd's 2011 Rate Case expenses were prudently incurred and reasonable. Fruehe based his opinion on his familiarity with ComEd rate case expenses for the past several rate cases, including flat fee arrangements used in 2011, as well as his working relationship with Exelon Business Services Company attorneys responsible for negotiating fee arrangements. Fruehe testified that the ComEd attorneys "are always looking for innovative proposals and methods to reduce costs and who ensure that outside counsel and other service providers are responsive to that goal."

¶ 94    Such testimony does nothing to assist the Commission in determining whether specific amounts expended for attorney fees were just and reasonable. Based on the extremely vague testimony by ComEd in this case regarding the 2011 Rate Case expenses and legal fees, we have no difficulty determining that the Commission correctly concluded that it could not "assess the justness and reasonableness of any amount expended by" ComEd "to compensate attorneys" for its 2011 Rate Case filing. 220 ILCS 5/9-229 (West 2012). The evidence proffered by ComEd before the Commission regarding its attorney fees does not inform anyone of the "justness and reasonableness" of its fees. There was no evidence as to specific amounts in fees, what each amount was for, the amount of time that was expended, the rates charged, or the reasonableness of those rates. Fruehe's testimony did not establish what law firms were paid or that the services were performed in any particular proceedings.

¶ 95    ComEd argues that the Act mandates that once a utility establishes a *prima facie* case that certain costs are reasonable, the Commission may "enter upon a hearing concerning the prudence and reasonableness of the costs incurred by the utility," and that during the hearing "each objection [to the reasonableness of costs] shall be stated with particularity and evidence provided in support thereof, after which the utility shall have the opportunity to rebut the evidence." 220 ILCS 5/16-108.5(d) (West 2012). But here the "evidence" of fees presented is a far cry from a *prima facie* showing of reasonableness of fees and expenses. There was essentially *no* evidence concerning the actual fees. Thus, there was no evidence of particular fees to even object to with any particularity.

¶ 96    ComEd also argues that its fees and expenses should have been allowed because no party challenged its fees and expenses as unreasonable. But we are unpersuaded by the fact that the Commission's staff investigated the attorney fees and expenses at issue and agreed that the fees and expenses were reasonable. Nothing in the Act provides that the Commission's staff's recommendations are to be given any weight on this issue, either by the Commission or by us on review of the Commission's order. The Act specifically provides that the Commission must hear and decide the prudence and reasonableness of fees. 220 ILCS 5/16-108.5(d) (West 2012). The Commission determined that the record was devoid of information establishing that payment to the entities was just and reasonable. We review only the Commission's determination and the evidence it relied on before it. We agree with the Commission's findings and conclusions which are considered *prima facie* true and the Commission's decision which

- 22 -

is considered *prima facie* reasonable. ComEd failed to carry its burden of proof to rebut these *prima facie* findings and decision. See 220 ILCS 5/10-201(d) (West 2012).

¶ 97   We are also unpersuaded that the Commission erred in refusing to allow ComEd an opportunity to "supplement" the evidentiary record by introducing evidence of fees after the fact. Before the Commission issued its final order, ComEd had filed a motion to supplement the record to introduce discovery materials in response to requests from the Commission's staff which, according to ComEd, "included 221 pages of invoices and other documents supporting the reasonableness of ComEd's expenses, and an affidavit, which declared that ComEd's costs of litigating the 2011 Rate Case were reasonable." The Act expressly provides:

"The Commission's determinations of the prudence and reasonableness of the costs incurred for the applicable calendar year shall be final upon entry of the Commission's order and shall not be subject to reopening, reexamination, or collateral attack in any other Commission proceeding, case, docket, order, rule or regulation, provided, however, that nothing in this subsection (d) shall prohibit a party from petitioning the Commission to rehear or appeal to the courts the order pursuant to the provisions of this Act." 220 ILCS 5/10-201(d) (West 2012).

¶ 98   ComEd argues that it moved to supplement the record before the final order, but nothing in the Act requires reopening the proofs after the hearing had already concluded. We note that, generally, a decision to reopen the proofs is discretionary. See *A-Tech Computer Services, Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 402 (1993) (the decision to reopen a case to allow the introduction of additional evidence rests within the discretion of the trial court). ComEd was given a full and fair opportunity to present its evidence. As the Commission found, "ComEd was afforded ample opportunity to present evidence on the subject. It chose to present virtually no evidence on the subject." As the administrative law judges pointed out, ComEd provided the Commission with no explanation as to why it could not have presented this evidence at the evidentiary hearing.

¶ 99   Furthermore, the administrative law judges reviewed the documents ComEd sought to enter into the record in its motion to supplement and found that many of the documents do not establish what services were actually performed, or included impermissible overhead expenses, and many entries were unrelated to the 2011 Rate Case and instead related to other matters.

We therefore affirm the portion of the Commission's order allowing only $200,000 paid as a statutory filing fee in costs and denying the remainder of fees and expenses sought by ComEd.

¶ 100                                    CONCLUSION

¶ 101   We find that ComEd did not meet its burden of showing error in any of the contested rulings. The billing determinants and cost allocation legal issues in this appeal have already been determined in the 2011 Rate Case, and we follow our opinion in *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 122860. Relitigation of the merits of those legal issues is barred by collateral estoppel. Regarding the factual findings, ComEd has failed to sustain its burden of rebutting the *prima facie* presumption that the Commission's factual findings are correct. ComEd also has not shown error in the Commission's ruling denying the 2011 Rate Case expenses. Accordingly, we affirm the Commission's order.

¶ 102    Affirmed.